IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| George Hooks, Markesse Farilien, and Kenneth Williams, | ) ) ) | Civil Action No. 2:20-cv-00238-DCN-MGB |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | **COMPLAINT** **(Title VII and Section 1981)** |
| Saulsbury Industries, Inc., | ) ) | **Jury Trial Requested** |
| Defendant. | ) ) ) | |

Plaintiffs George Hooks, Kenneth Williams, and Markesse Farilien, by way of their Complaint in the above-captioned matter, would allege and show unto this Honorable Court the following:

## NATURE OF THE ACTION

1.     This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("§ 1981") alleging a racially-hostile work environment, disparate treatment, and retaliation.

## PARTIES, JURISDICTION, AND VENUE

2.     Defendant Saulsbury Industries, Inc. ("Saulsbury") is a corporation incorporated in the state of Texas and has routinely conducted business in Georgetown County, South Carolina during the relevant time period at issue in this action and as the acts and/or omissions giving rise to the causes of action occurred in Georgetown County, South Carolina.

3.     Plaintiffs Hooks and Farilien are residents of Berkeley County, South Carolina and Plaintiff Williams is a resident of Charlton County, Georgia.

4.     At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce and employing fifteen (15) or more employees within the meaning of Sections 701 of Title VII, 42 U.S.C. § 2000e(b), (g), and (h).

5.     Within 300 days of the unlawful employment practices complained of here, each of the Plaintiffs herein filed a Charge with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 415-2019-00105 (Hooks Charge), Charge No. 14C-2019-00153 (Williams Charge), and Charge No. 415-2019-00776 (Farilien Charge).

6.     On or about October 25, 2019, the EEOC issued a Notice of Right to Sue to Williams.

7.     On or about December 6, 2019, the EEOC issued a Notice of Right to Sue to Farilien.

8.     On or about December 9, 2019, the EEOC issued a Notice of Right to Sue to Hooks.

9.     Each of the Plaintiffs have timely filed this action within ninety (90) days of the date of their Notice of Right to Sue letters and have exhausted all administrative prerequisites.[1]

10.     Based upon the above, jurisdiction and venue are proper in this Court.

## FACTUAL ALLEGATIONS

## GENERAL ALLEGATIONS AS TO ALL PLAINTIFFS

11.     The Winyah Generating Station ("Winyah" or "the plant"), located in Georgetown, is owned and operated by Santee Cooper and provides coal-based energy.

12.     In 2017, Defendant Saulsbury was awarded a contract from Santee Cooper for structural, mechanical, piping, and electrical work at the plant.

13.     Consequently, Defendant began advertising and hiring for employees to perform work at the plant.

---

[1] Section 1981 does not require an employee to file a charge of discrimination, harassment, or retaliation with the EEOC or other agency. Thus, the administrative exhaustion prerequisites apply only to the Title VII claims.

14. The three Plaintiffs, all hired to work on the project, are African American. Plaintiff Farilien is both African American and Hispanic.

15. Plaintiff Hooks was originally hired in May 2018 as a "Journeyman Pipefitter." Approximately one month later, he was moved to a "Foreman Pipefitter" position where he supervised a crew of pipefitters.

16. Plaintiff Farilien was originally hired on or about June 25, 2018, as a "Pipefitter, Apprentice III," and was placed as a member of Hooks' crew.

17. Plaintiff Williams was originally hired on or about October 1, 2018, as a "Journeyman Pipefitter" and was placed as a member of Hooks' crew.

18. Throughout the course of their employment with Saulsbury, Plaintiffs and other African American employees were repeatedly subject to, and complained about, a racially-hostile work environment and disparate treatment due to their race.

19. For example, Plaintiffs and other African American employees were all assigned to a predominately African American pipefitting crew by Saulsbury. Saulsbury management referred to the predominately African American work crew as "the black crew." This is the crew that Hooks was a member of and supervised until his termination.

20. Each of the Plaintiffs personally experienced a racially hostile work environment. They were routinely subjected to racially offensive language, symbols, and treatment by their non-African American supervisors and coworkers. They were routinely subjected to disparate terms and conditions of employment when compared with their non-African American coworkers.

21. During Plaintiffs' employment with Saulsbury, Tibor Matuska ("Matuska") was the Construction Manager for the Project and Marty Gaylon ("Gaylon") was the Pipe Department Superintendent. Both Matuska and Gaylon were Caucasian.

22.     Matuska led the others at the Project by example. He frequently used the "N" word at the Project worksite.

23.     Furthermore, Matuska often referred to African Americans as "n----r," "boy," and other racially-offensive names.

24.     Superintendents and other supervisors followed his example.

25.     Supervisors made remarks to and about African Americans using the "N" word.

26.     In addition to regular use of the "N" word, other overt racial slurs and racially derogatory terms and language were also commonplace amongst Saulsbury personnel and employees. For example, Saulsbury management, personnel, and employees, regularly called Plaintiffs and other African American employees racially derogatory names including "monkeys," "boys," and "savages," among others.

27.     Racially offensive symbols and imagery were also commonplace at the Project. The following are only some examples:

        a.      A drawing of a stick figure with a black shaded-in face with the words "NEGRO LOKA" written prominently in capital letters above it was drawn on a fan used on the project where the "black crew" was working (Exhibit A);

        b.      Racial imagery and statements such as "ni***r go back home" and "ni***rs don't deserve to be here" appeared throughout the worksite including in the portable toilets that employees used;

        c.      The Confederate flag was prominently displayed throughout the worksite at the project, including, by way of example, on other non-African American employees' hardhats and clothing;

d.      Some employees who worked in the position of Rigger and had the word "Rigger" on their shirts would alter the label to make it look like the word "Ni***r"; and

e.      Plaintiffs were also referred to as "savages" by management and other coworkers and some coworkers wrote the term "savage" or placed stickers with the word "savage" on their hardhats and clothing in reference to the African American workers.

28.      The same supervisors that used racial slurs and racially derogatory language were also making many of the employment decisions, including job assignments, disciplinary decisions, hiring, promotion, demotion, and pay decisions.

29.      The racial environment at Saulsbury was not confined to racial slurs and symbols, but infected numerous managerial decisions and practices. Plaintiffs and other African American employees were frequently treated differently than non-African American employees in some or all of the following ways:  being excessively scrutinized, excessively monitored, and made to perform the least desirable jobs, sometimes in dangerous conditions, while non-African American employees were allowed to work without being harassed by supervisors, take breaks in an air-conditioned break room, and work on desirable jobs in desirable conditions.

30.      Plaintiffs and other African American employees were subjected to disparate terms and conditions of employment, including promotion, job assignments, and discipline, when compared to their similarly situated non-African American coworkers. African Americans were also often given the tougher, more physically intensive, more dangerous, more uncomfortable, and more laborious work than their similarly situated non-African American coworkers.

31.      By way of example, Plaintiffs and other African Americans were not provided needed equipment for their jobs, including work trucks, carts, and other equipment and machinery that non-African American crews and employees were provided. Nevertheless, Plaintiffs and

members of the "black crew" were required to perform unsafe tasks such as carrying heavy piping for distances longer than the length of several football fields without carts or trucks in extremely hot conditions, while non-African American employees were not required to conduct similar work in similar extreme conditions without proper tools and equipment and were provided trucks and other equipment by Saulsbury.

32.    On some occasions, for example, members of the "black crew" were required to haul heavy pipes on an approximately sixty (60) foot high "pipe bridge" with a rope in extremely hot conditions, while other non-African American employees were not. While the members of the "black crew" were having to perform such intensive labor without proper equipment or safety measures in the extreme heat, other non-African American foremen and supervisors would drive by in their work vehicles and laugh and make racially offensive statements to them such as "look at those monkeys" and mock them about being careful not to fall from the high pipe bridge.

33.    On other occasions, Plaintiffs and other African American employees were strictly scrutinized and monitored, sometimes with the use of binoculars and a "lookout" person, while being ordered to work in the extreme heat without proper tools or equipment. For example, on one occasion, Plaintiffs overheard Matuska loudly ordering Gaylon to strictly monitor the "black crew" with binoculars while they were performing dangerous job duties without proper equipment or tools and to "watch these ni***rs and make sure they're working."

34.    On another occasion, Gaylon was overheard loudly saying "don't send a boy to do a man's job" to another managerial employee in reference to Plaintiffs and their African American crew.

35.    Plaintiffs and other African Americans were also prohibited from eating in the employee break room at the worksite, which was air conditioned. Instead of being allowed to eat in the air-

conditioned break room with the other employees, Plaintiffs and other African American employees were forced to eat outside in the extreme heat which often exceeded 110 degrees during the time at issue.

36.     The concerns of Plaintiffs and other African American employees relating to the racially hostile work environment and disparate terms and conditions of employment to which they were subjected were brought to the attention of upper-level management and Human Resources at Defendant's corporate offices.

37.     Specifically, on or about October 22, 2018, George Hooks filed a formal complaint of racial discrimination and harassment with Teresa Moore in the corporate human resources department on behalf of himself and other African Americans on his crew who had complained about the racial discrimination and harassment to him as their crew lead. He also complained to Kelly Storms in human resources.

38.     On or about October 26, 2018, Plaintiff Williams also contacted Kelly Storms about the racial discrimination and harassment, but he received no response to his complaint whatsoever.

39.     On or about October 26, 2018, Plaintiff Hooks filed a charge of racial discrimination and harassment with the EEOC.

40.     Hooks was terminated on November 1, 2018.

41.     Despite being fully aware of the harassment and discrimination through multiple complaints of such, Saulsbury never effectively addressed, or even attempted to address, the harassment and discrimination that created a racially hostile work environment and disparate terms of employment for Plaintiffs and other African American employees. As a result, harassers were free to continue their racial torment.

42.     For example, following the above formal complaints, a Caucasian employee called Farilien the "N word" on the worksite. Farilien reported the Caucasian employee's racial language to management, but Defendant continued to take no action to investigate or remediate the continuing racially hostile work environment.

43.     Additionally, the use of racially offensive language by management and others continued after the above referenced complaints to Defendant. Likewise, Plaintiffs and other African American employees continued to be prohibited from using the air-conditioned break room as other non-African American employees were allowed to. Further, not only did racial graffiti continue to remain on the worksite, but additional racial graffiti was added thereafter. Coworkers also continued to display racial symbols and paraphernalia such as the Confederate flag and "savage" stickers on their hardhats and clothing while at the worksite.

## FACTS RELATING TO PLAINTIFF HOOKS

44.     Plaintiff Hooks incorporates all of the above as if set forth verbatim herein.

45.     Plaintiff Hooks was originally hired in May 2018 as a "Journeyman Pipefitter." Approximately one month later, he was moved to a "Foreman Pipefitter" position where he supervised a crew of pipefitters.

46.     As further described above, Hooks was subjected to a racially hostile work environment and subjected to disparate terms of employment when compared to other non-African American employees throughout the time that he was employed at Saulsbury, including, but not limited to, exposure to racial epithets, racial graffiti and symbols, racial comments made by supervisors, and other high-level management, and other working conditions and terms as set forth above.

47.     Additionally, Plaintiff Hooks was subjected to disciplinary action and reprimand for reasons that other non-African American employees were not subject to.

48.    For example, Plaintiff Hooks received a written counseling notice on or about October 19, 2018, for alleged inappropriate use of his cell phone during work hours. However, Plaintiff Hooks, as a foreman at the time, was authorized to use his cell phone during work hours and even had a cell phone authorization sticker on his work helmet indicating such. His cell phone usage was for work purposes and in full compliance with Defendant's own guidelines.

49.    When presented with the disciplinary counseling forms on October 19, 2018, Hooks immediately requested to speak with Liza Gross in Human Resources. Shortly thereafter and on the same day, he spoke with Gross and Gaylon to complain about why he believed the discipline was inappropriate and stated that he believed he was being singled out on the basis of his race when other non-African American employees who engaged in the same or similar conduct were not receiving discipline for the purported reasons Mr. Hooks was. Ms. Gross ignored Hooks' complaints and he received the written discipline without any further investigation.

50.    The very next day and despite the fact that there was absolutely no mention whatsoever of a potential demotion at the meeting with Liza Gross the day prior, on October 20, 2018, Plaintiff Hooks was demoted from his foreman position and received a $4.00 per hour decrease in pay.

51.    Unsatisfied with the company's failure to investigate his complaints at all, on or about October 22, 2018, Hooks filed a formal complaint of racial discrimination and harassment with Teresa Moore in the Corporate Human Resources department on behalf of himself and other African Americans on his crew who had complained about the racial discrimination and harassment to him as their crew lead.  Hooks specifically referenced him and his crew being called "monkeys," "boys," not being provided comparable tools and trucks to his white

counterparts, being watched through binoculars by white supervisors, and not being able to eat in the air-conditioned break room with the other employees.

52.     Furthermore, on or about October 26, 2018, Hooks filed a charge of racial discrimination and harassment with the EEOC.

53.     Saulsbury never interviewed Hooks, Farilien, Williams, or any other African-Americans working on Hooks' pipefitting crew as part of any investigation into Hooks' or Williams' complaints.

54.     Instead, Saulsbury immediately terminated Hooks on November 1, 2018, in retaliation for his protected activity of complaining about racial discrimination and harassment to both Saulsbury Human Resources and the EEOC.

## FACTS RELATING TO PLAINTIFF FARILIEN

55.     Plaintiff Farilien incorporates all of the above as if set forth verbatim herein.

56.     Plaintiff Farilien was originally hired on or about June 25, 2018, as a "Pipefitter, Apprentice III," and also a member of Hooks' crew.

57.     As further described above, Farilien was subjected to a racially hostile work environment and subjected to disparate terms of employment when compared to other non-African American employees throughout the time that he was employed at Saulsbury, including, but not limited to, exposure to racial epithets, racial graffiti and symbols, racial comments made by supervisors, and other high-level management, and other working conditions and terms as set forth above.

58.     Defendant was placed on notice of the racially hostile work environment when Hooks complained on behalf of himself and his African American crew, including Farilien, about work conditions, as further described above.

59.    Despite Hooks' complaint, Williams' complaint, and the company's knowledge of a racially hostile work environment, Defendant took no remedial action.

60.    As such, Farilien continued to endure a racially hostile work environment. For example, following the complaints a white employee, Isaiah Clark, called Farilien a "ni***r." Farilien reported the incident to his supervisor, Travis Carson, but no action was taken.

61.    In November 2018, Farilien and a white coworker applied for a raise. The white coworker received a raise but Farilien did not.

62.    When Farilien did not receive the raise, he inquired with Marty Gaylon and Liza Gross in Human Resources as to why the white coworker had received the raise and he had not. Gaylon and Gross advised Farilien that "he had a write-up in his file," however Farilien had never received any write-ups throughout his employment. When the error was discovered, Defendant still did not provide Farilien with a raise.

## FACTS RELATING TO PLAINTIFF WILLIAMS

63.    Plaintiff Williams incorporates all of the above as if set forth verbatim herein.

64.    Plaintiff Williams was originally hired on or about October 1, 2018, as a "Journeyman Pipefitter" and was placed as a member of Hooks' crew.

65.    As further described above, Williams was subjected to a racially hostile work environment and subjected to disparate terms of employment when compared to other non-African American employees throughout the time that he was employed at Saulsbury, including, but not limited to, exposure to racial epithets, racial graffiti and symbols, racial comments made by supervisors, and other high-level management, and other working conditions and terms as set forth above.

66.     As also further set forth above, on or about October 26, 2018, Plaintiff Williams contacted Kelly Storms in human resources about the racial discrimination and harassment, but he received no response to his complaint whatsoever.

67.     In spite of his complaint of a racially hostile work environment and discrimination to human resources, Defendant took no action whatsoever to investigate the matter and continued to subject Plaintiff Williams and other African American coworkers to a racially hostile work environment.

### FIRST CAUSE OF ACTION
**Violation of Title VII**
**(Discrimination/Hostile Work Environment on the Basis of Race)**

68.     Plaintiffs reallege each and every allegation contained above as if repeated here verbatim.

69.     Defendant engaged in a pattern and practice of unlawful discrimination and harassment and subjected each Plaintiff to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended.

70.     Saulsbury has discriminated against the Plaintiffs by subjecting them to a racially hostile work environment and by discriminating against them with respect to their pay, work assignments and duties, and terms and conditions of their employment.

71.     Throughout their employment with Saulsbury, Plaintiffs were each subjected to racial comments, racial statements, racial graffiti, and racial paraphernalia, including having to endure the common and repeated usage of racially offensive comments and names such as "ni***r," "monkey," "boy," and "savage" by Saulsbury co-employees and Saulsbury supervisors and management, as well as having to endure the common and repeated display of racial graffiti and symbols, such as "ni***r go back home" and "ni***rs don't deserve to be here" throughout the workplace of Saulsbury.

72.     Such racially hostile work environment to which Plaintiffs were subjected was both severe and pervasive and, accordingly, affected the terms and conditions of their employment.

73.     Plaintiffs have complained to Defendant, including by and through human resources, upper-level management, and their own supervisors about the racially hostile work environment. Defendant, however, has conducted no reasonable or adequate investigation into these complaints and has failed to implement adequate procedures or take adequate remedial action to correct the racially hostile work environment.

74.     Defendant at all times relevant hereto had actual and constructive knowledge of the conduct described herein.

75.     Defendant failed to take all reasonable steps to prevent the discrimination and harassment based on race from occurring.

76.     Defendant violated Title VII of the Civil Rights Act of 1964, as amended, by failing to adequately supervise, control, or discipline and/or otherwise penalize the conduct, acts, and failures to act of Defendant as described herein.

77.     As a direct and proximate result of Defendant's violations of Title VII of the Civil Rights Act of 1964, as amended, Plaintiffs have suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress; and they have suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

78.     Defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, and with utter disregard for Plaintiffs' rights protected by federal law and, therefore, Plaintiffs are entitled to recover punitive damages.

## SECOND CAUSE OF ACTION
### Violation of 42 U.S.C. § 1981
### (Discrimination/Hostile Work Environment on the Basis of Race)

79.   Plaintiffs reallege each and every allegation contained above as if repeated here verbatim.

80.   Under 42 U.S.C. § 1981, as amended, all persons are guaranteed the same right to make and enforce contracts as Caucasians and intentional racial discrimination, harassment, and retaliation in the making and enforcement of public and private contracts is prohibited.

81.   The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationships.

82.   At all times relevant, each of the Plaintiffs were in a contractual relationship with Defendant within the meaning of 42 U.S.C. § 1981, as amended.

83.   During the course of Plaintiffs' employment, Defendant, by and through its employees, agents, and officers, violated each of the Plaintiffs' rights by depriving them of the right to the enjoyment of all benefits, privileges, terms, and conditions of their employment contracts as is enjoyed by non-African-American citizens, in violation of 42 U.S.C. § 1981(b), as amended.

84.   During the course of Plaintiffs' employment with Defendant, Plaintiffs have not enjoyed the same benefits, privileges, terms, and conditions of employment, as have non-African-American employees of Defendant.

85.   Defendant's treatment, practices, and policies directed toward Plaintiffs, as more fully described above, denied each of them the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by non-African-American citizens, in violation of 42 U.S.C. § 1981, as amended.

86.    Saulsbury has discriminated against the Plaintiffs by subjecting them to a racially hostile work environment and by discriminating against them with respect to their pay, work assignments and duties, and terms and conditions of their employment.

87.    Throughout their employment with Saulsbury, Plaintiffs were each subjected to racial comments, racial statements, racial graffiti, and racial paraphernalia, including having to endure the common and repeated usage of racially offensive comments and names such as "ni***r," "monkey," "boy," and "savage" by Saulsbury co-employees and Saulsbury supervisors and management, as well as having to endure the common and repeated display of racial graffiti and symbols, such as "ni***r go back home" and "ni***rs don't deserve to be here" throughout the workplace of Saulsbury.

88.    Such racially hostile work environment to which Plaintiffs were subjected was both severe and pervasive and, accordingly, affected the terms and conditions of their employment.

89.    Plaintiffs have complained to Defendant, including by and through human resources, upper-level management, and their own supervisors about the racially hostile work environment. Defendant, however, has conducted no reasonable or adequate investigation into these complaints and has failed to implement adequate procedures or take adequate remedial action to correct the racially hostile work environment.

90.    Defendant at all times relevant hereto had actual and constructive knowledge of the conduct described herein.

91.    Defendant failed to take all reasonable steps to prevent the discrimination and harassment based on race from occurring.

92.    Through its actions and treatment of Plaintiffs, as more fully described above, Defendant intended to discriminate against and harass each of the Plaintiffs on the basis of their race.

93.     Defendant was wanton, reckless, and intentional in its discrimination and harassment against Plaintiffs.

94.     As a direct and proximate result of Defendant's intentional discrimination and harassment on the basis of race, each of the Plaintiffs have suffered lost wages, benefits, future employment opportunities, interest, front pay, embarrassment, humiliation, pain and suffering, mental anguish, loss of enjoyment of life, attorneys' fees, and costs.

### THIRD CAUSE OF ACTION
**(Retaliation under Title VII)**

95.     Plaintiffs reallege each and every allegation contained above as if repeated here verbatim.

96.     As herein alleged, Defendant illegally retaliated against the Plaintiffs by subjecting them to a continued and elevated hostile work environment shortly following their complaints to upper-level management, human resources, and their own managers.

97.     As further herein alleged, Defendant illegally retaliated against Plaintiff Hooks by subjecting him to unjust discipline, including unwarranted writeups, by demoting him and decreasing his pay, by subjecting him to a continued and elevated hostile work environment, and by firing him because he had reported illegal discrimination and harassment on the basis of his race, not only on behalf of himself, but also on behalf of his entire crew of African American workers.

98.     As further herein alleged, Defendant illegally retaliated against Plaintiff Farilien by refusing to provide him a raise in pay when it did provide a raise in pay to a similar Caucasian coworker, by falsely stating that Farilien had not received the raise because he purportedly had been previously written up (which was a false statement), and by subjecting him to a continued and elevated hostile work environment, all following Hooks' and Williams' complaints made on his behalf.

99.    As further herein alleged, Defendant illegally retaliated against Plaintiff Williams by subjecting him to a continued and elevated hostile work environment following his complaint and Hooks' complaints to human resources of racial harassment and discrimination.

100.    Defendant took such retaliatory actions against Plaintiffs and illegally retaliated against them shortly following their complaints described above, which were protected activity. Defendant had no legitimate business reasons for any of such acts.  Each of said acts of retaliation are in violation of Title VII of the Civil Rights Act of 1964, as amended.

101.    As a direct and proximate result of Defendant's willful, knowing and intentional discrimination and retaliation against them, each of the Plaintiffs herein have suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress.  Each of the Plaintiffs have suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Each of the Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

102.    Defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, and with utter disregard for Plaintiffs' rights protected by federal law and, therefore, Plaintiffs are entitled to recover punitive damages.

### FOURTH CAUSE OF ACTION
### (Retaliation under 42 U.S.C. 1981)

103.    Plaintiffs reallege each and every allegation contained above as if repeated here verbatim.

104.    As more fully set forth above, Defendant's business activities involve those to which 42 U.S.C. 1981 applies.

105.    As herein alleged, Defendant illegally retaliated against the Plaintiffs by subjecting them to a continued and elevated hostile work environment shortly following their complaints to upper-level management, human resources, and their own managers.

106.    As further herein alleged, Defendant illegally retaliated against Plaintiff Hooks by subjecting him to unjust discipline, including unwarranted writeups, by demoting him and decreasing his pay, by subjecting him to a continued and elevated hostile work environment, and by firing him because he had reported illegal discrimination and harassment on the basis of his race, not only on behalf of himself, but also on behalf of his entire crew of African American workers.

107.    As further herein alleged, Defendant illegally retaliated against Plaintiff Farilien by refusing to provide him a raise in pay when it did provide a raise in pay to a similar Caucasian coworker, by falsely stating that Farilien had not received the raise because he purportedly had been previously written up (which was a false statement), and by subjecting him to a continued and elevated hostile work environment, all following Hooks' and Williams' complaints made on his behalf.

108.    As further herein alleged, Defendant illegally retaliated against Plaintiff Williams by subjecting him to a continued and elevated hostile work environment following his complaint and Hooks' complaints to human resources of racial harassment and discrimination.

109.    Defendant took such retaliatory actions against Plaintiffs and illegally retaliated against them shortly following their complaints described above, which were protected activity. Defendant had no legitimate business reasons for any of such acts.  Each of said acts of retaliation are in violation of Section 1981.

110.    As a direct and proximate result of Defendant's willful, knowing and intentional discrimination and retaliation against them, each of the Plaintiffs herein have suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress.  Each of the Plaintiffs have suffered and will continue to suffer a loss of earnings and

other employment benefits and job opportunities. Each of the Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

111.     Defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, and with utter disregard for Plaintiffs' rights protected by federal law and, therefore, Plaintiffs are entitled to recover punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1)     Order the Defendant to institute and carry out policies, practices and programs that provide equal employment opportunities to qualified individuals which are intended to eradicate the effects of past and present unlawful employment practices;

2)     Order the Defendant to make them whole with appropriate lost earnings, future lost earnings, compensation for loss of future pensions and benefits with pre-judgment and post-judgment interest as applicable;

3)     Order the Defendant to make them whole by providing all compensation contemplated under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*, and all compensation contemplated under the Civil Rights Act of § 1866, 42 U.S.C. § 1981, for non-pecuniary losses including, without limitation, pain, suffering, inconvenience, loss of quality of life, humiliation, loss of reputation and mental anguish in amounts to be proven at trial, along with pre-judgment and post-judgment interest as applicable;

4)     Order the Defendant to pay them punitive damages in amounts to be proven at trial with pre-judgment and post-judgment interest as applicable and in amounts to adequately punish the Defendant for engaging in this conduct and to prevent this conduct in the future;

     5)    Order the Defendant to pay their reasonable attorneys' fees, expert fees, and all costs incurred in bringing and prosecuting this action with pre-judgment and post-judgment interest as applicable; and

     6)    Enter an order providing all such other relief as this Court deems appropriate.


                FALLS LEGAL, LLC


                s/ J. Scott Falls
                J. Scott Falls
                Federal I.D. No.  10300
                E-mail:  scott@falls-legal.com
                Ashley L. Falls
                Federal I.D. No. 12083
                E-mail:  ashley@falls-legal.com
                245 Seven Farms Drive, Suite 250
                Charleston, South Carolina  29492
                Telephone: (843) 737-6040
                Facsimile:  (843) 737-6140

                Counsel for Plaintiffs

Charleston, South Carolina
January 23, 2020

# **<u>EXHIBIT A</u>**

Example of Racial Graffiti at
Defendant's Worksite

